IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION |
| | : | NO. 10-420 |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO. 13-1851 |
| | : | |
| MARCUS WHITE | : | |

**MEMORANDUM OPINION**

Tucker, C. J.                                                                                                           October 30, 2013

Presently before the Court is Defendant Marcus White's Habeas Corpus Petition to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Doc. 163) and the Government's Response (Doc. 166). Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Defendant's motion will be denied.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

Marcus White ("White" or "Petitioner") filed the instant *pro se* Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, alleging violation of his due process rights.[1] On April 26, 2011, a grand jury in the Eastern District of Pennsylvania returned a superseding indictment of Marcus White, charging him with the following: one count of

---

[1] On September 5, 2012, Petitioner filed his first Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. (Doc. 139.) On October 18, 2012, the Government filed a Motion to Dismiss without prejudice because Petitioner had an appeal pending before the Third Circuit Court of Appeals. (Doc. 144.) Accordingly, the Court dismissed Petitioner's first habeas petition without prejudice on November 7, 2012. (Doc. 152.) On April 9, 2013, Petitioner filed the instant second Motion to Vacate, Set Aside, or Correct Sentence. (Doc. 163.)

1

conspiracy, in violation of 18 U.S.C. § 371; one count of conspiracy to commit robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951 (the "Hobbs Act"); one count of robbery of a postal employee, in violation of 18 U.S.C. § 2114; two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); three counts of carrying and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). On July 11, 2011, a jury trial commenced, and on July 14, 2011 the jury found Petitioner guilty on all ten counts of the superseding indictment. On November 1, 2011, this Court sentenced Petitioner to 804 months imprisonment, five years supervised release, a $1,000 assessment, and $95,816.66 in restitution.

Petitioner's motion stems from the July 11, 2011 suppression hearing testimony of Maryland State Police ("MSP") Trooper Andre Butler ("Trooper Butler"). Trooper Butler, a police officer stationed at the College Park Barrack in Prince George's County, was on duty on June 2, 2010 — the day of the traffic stop leading to Petitioner's arrest. According to Trooper Butler, as he was patrolling near Highway I-95, he passed a silver Kia minivan, driven by Petitioner,[2] which bore a Pennsylvania license plate. At that time, Butler's police car was equipped with a License Plate Reader ("LPR"). The Maryland License Plate Reader program is a first-in-the-nation statewide network for license plate recognition, which was established as a crime prevention initiative. The program uses cameras and computers to scan vehicle license

---

[2] In Trooper Butler's official Statement of Probable Cause, he states that the driver of the car is Tyrone Edwards. (See Pet'r's Mot. Ex. 3 at 7.) However, in both Petitioner's Motion (See Pet.'r's Mot. Ex. 3 at 10), and the Government's Response, Petitioner is identified as the driver of the vehicle.

plates and match those plates against databases of stolen vehicles, wanted persons, and other law enforcement databases. The Maryland Coordination and Analysis Center's ("MCAC") central server currently houses LPR data, allowing state law enforcement to retrieve data from the network.[3]

As Trooper Butler drove by the vehicle, he allegedly received a stolen vehicle alert via his car's LPR. Trooper Butler subsequently verified through the MSP College Park Barrack that the vehicle had been reported stolen in Pennsylvania. Thereafter, he initiated a traffic stop. During the traffic stop, the following evidence was discovered in the car: (i) a black backpack containing Petitioner's prison/parole document, (ii) a red plastic bag which contained various postal and Western Union money orders from Turkey Hill mini markets, and (iii) a handgun contained in a locked box under the front seat. Maryland law enforcement then reached out to

---

[3] See generally Maryland Coordination and Analysis Center, License Plate Reader Program, http://www.mcac.maryland.gov/resources/LPR/ (last visited Oct. 25, 2013), which states:

> License Plate Reader (LPR) technology provides Maryland law enforcement with automated detection of a vehicle's license plate as they pass the reader. The LPR system consists of a high-speed camera, mounted either at a fixed location or on a mobile patrol vehicle, and a computer to convert data from electronic images of vehicle license plates into a readable format, and then compare the information against specified databases of license plates. The system attaches camera identification, date, time, and location information, to include GPS coordinates, to the digital image and it is maintained electronically in a central location to provide a means of ensuring the license plate number was properly converted. The digital image can include additional information such as:
> 
> - The vehicle's make and model
> - The vehicle's driver and passengers
> - Distinguishing features (e.g., bumper stickers, damage)
> - State of registration
> 
> If a given plate is listed in the database, the system is capable of providing the vehicle's location, direction of travel, and the type of infraction related to the notification.

the Lower Pottsgrove Township (Pennsylvania) Police Department and the relevant Pennsylvania postal inspectors, who traveled to Maryland and retrieved the seized evidence. Subsequently, at the suppression hearing, the Court denied Petitioner's motion to suppress on the grounds that the information received from the LPR provided probable cause for the stop of the vehicle. The evidence found in the vehicle formed the basis for Petitioner's conviction.

## II. LEGAL STANDARD

A federal prisoner in custody under the sentence of a federal court may, within one year from when the judgment becomes final, move the sentencing court to "vacate, set aside, or correct" a sentence "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). In a § 2255 motion, a federal prisoner may attack his sentence on any of the following grounds: (1) "that the judgment was rendered without jurisdiction;" (2) "that the sentence imposed was not authorized by law or otherwise open to collateral attack;" or (3) "that there has been such a denial or infringement of the Constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b).

Section 2255, however, does not afford a remedy for all errors that may have been made at trial or sentencing. United States v. Essig, 10 F.3d 968, 977 n. 25 (3d Cir.1993) (citing United States v. Addonizio, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979)). Rather, § 2255 permits habeas relief for an error of law or fact constituting a "fundamental defect which inherently results in a complete miscarriage of justice." United States v. Eakman, 378 F.3d 294, 298 (3d Cir.2004). If the court determines that the sentence was not authorized by law, was unconstitutional, or otherwise open to collateral attack, the court must vacate the judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. See 28 U.S.C. § 2255(b).

Conversely, a court may dismiss a §2255 motion where the record shows conclusively that the movant is not entitled to relief. United States v. Nahodil, 36 F.3d 323, 326 (3d Cir.1994).

Further, the Court notes that *pro se* pleadings are traditionally construed quite liberally. However, a *pro se* petitioner is not excused from the duty to prove a "set of facts in support of [his] claim which would entitle [him] to relief." Haines v. Kerner, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

### III. DISCUSSION

**A. Petitioner's Asserted Grounds for Relief and the Government's Response**

Petitioner's motion is based on four grounds: (1) The conviction was based on evidence obtained from an unlawful arrest; (2) The Government violated his constitutional rights by knowingly offering the perjurious testimony of Trooper Butler at the suppression hearing; (3) The conviction was obtained by use of evidence gained as a result of an unlawful search and seizure;[4] and (4) Defense counsel was ineffective for not investigating the LPR which led to Petitioner being stopped by the Maryland State Police. A review of Petitioner's submission reveals that each of his asserted grounds for relief is based on the same claim: that his constitutional rights were violated because the Government suborned perjury in the form of MSP Trooper Butler's testimony that his attention was drawn to Petitioner when his LPR alerted that the car Petitioner was driving had been reported stolen. Specifically, Petitioner avers that Trooper Butler's LPR could only identify stolen cars from the Maryland area, and thus he

---

[4] The Court agrees with the Government that there appears to be no difference between Petitioner's first and third grounds for relief. (See Govt.'s Resp. n. 1.)

presented perjured testimony by testifying that his LPR recognized a vehicle that was reported stolen in Pennsylvania.

In support of his claim, Petitioner presents a January 24, 2013 letter, written on Maryland State Police stationery, that he received from Sergeant John Pietanza ("Sergeant Pietanza") of the College Park Barrack (Pet'r's Mot. Ex. 3 at 5.) Petitioner received this letter as a result of an information request he made pursuant to Maryland's Public Information Act. In this letter, Sergeant Pietanza states, "The MCAC program began in March of 2010. The MCAC central server houses LPR data from Maryland law enforcement agencies and *is not nationwide*." (Id.) (emphasis added). Based on this letter, Petitioner argues that Trooper Butler did not have probable cause to stop the vehicle because his LPR did not have access to a nationwide database, and therefore could not have identified the vehicle as stolen. Plaintiff requested an evidentiary hearing to resolve this issue.

In response, the Government denies the four grounds of Petitioner's motion, and argues that Trooper Butler's LPR did have the capacity to identify cars reported stolen to the National Crime Information Center ("NCIC"), a nationwide database (Gov't's Resp. at 8.) Although the Government maintains that Trooper Butler's testimony at the suppression hearing establishes that the LPR did in fact detect that Petitioner's vehicle was reported stolen, the Government concedes that the existing record did not explain how the overall LPR system is configured. (Id. at 9.) Accordingly, the Government agreed that an evidentiary hearing was necessary due to Sergeant Pietanza's "ambiguous" and "misleading" statement that the MCAC does not house nationwide data. (Id. at 8-9.)

The Court, in agreement with the parties, held an evidentiary hearing on September 18, 2013 and oral arguments on October 9, 2013 to explore this issue. See Gov't of Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989) ("When a motion is made under 28 U.S.C. § 2255 the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record. Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.") (citing Gov't of the Virgin Islands v. Bradshaw, 726 F.2d 115, 117 (3d Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984)). Further, pursuant to Rule 8(c) of the Rules Governing Habeas Corpus Proceedings and 18 U.S.C. § 3006A, the Court appointed counsel to represent Petitioner in connection with the evidentiary hearing.

**B. The Evidentiary Hearing**

The Government presented three witnesses at the September 18, 2013 hearing. The first was Sergeant Julio Valcarcel, Jr. ("Sergeant Valcarcel"). In June 2010, Sergeant Valcarcel worked for the Maryland State Police and was assigned to the Information Technology Division. (Tr. 9/18/13 6:9-15.) Sergeant Valcarcel had served in this capacity since August 2000, and was responsible for the administration of Maryland's License Plate Reader program. (Id. 6:19-7:3.) Sergeant Valcarcel began working with Maryland's LPRs when that program began in 2005. (Id. 7:6-11; 8:7-10.) The College Park Barrack, to which Trooper Butler was assigned, received four LPR units around late 2009 or early 2010. (Id. 8:10-13.) Importantly, Sergeant Valcarcel testified that in June 2010, the server with which the LPRs communicated was located in the

MSP headquarters. (Id. 9:15-19.) Sergeant Valcarcel was responsible for the maintenance and service of that server. (Id. 9:18-19.) Subsequently, the LPR server was relocated to the MCAC, (Id. 9:12-15). However, in June 2010 the MCAC was not yet in existence. (Id. 8:21-22; 9:20-23.)

Sergeant Valcarcel explained that the Information Technology Division "managed various units that received information from the server." (Id. 10:2-3.) In particular, Sergeant Valcarcel testified as follows:

> The server works in two ways, it stores the data [it] reads from the various License Plate Readers and it also manages those by sending out the hot lists. The hot lists at the time were two, the NCIC hot list from the FBI and the Maryland Motor Vehicle Administration database.

(Id. 10:3-9.) Sergeant Valcarcel went on to explain that the NCIC includes reports of vehicles stolen nationwide. (Id. 10:10-15.)[5] Sergeant Valcarcel then explained that the Federal Bureau of Investigation ("FBI") updates the NCIC's list of stolen vehicles twice a day: at 6:30 am and 4:00 pm. (Id. 10-21:24.) In addition, Sergeant Valcarcel testified that he set up the server to "push" the updated lists out to the LPRs at 7:45 am and 4:45 pm. (Id. 13:24-14:10.) Further, the list would include any vehicle reported stolen nationwide to the NCIC within a six month window. (Id. 10:24-11:3.)

Sergeant Valcarcel further testified that, in addition to the server sending information to the LPRs, the LPRs also transmit information wirelessly back to the server. (Id. 19:6-19.) Specifically, the LPRs transmit images of a license plate (a "read") to the server in batches. (Id.

---

[5] Sergeant Valcarcel further elaborated: "The process for any police department, irrespective of whether it's Philadelphia or Maryland State Police, [is that] once a [vehicle theft] report is taken, an operator will enter the information from the police report into the NCIC system, into the FBI. It goes through a quality control check very quickly and then…it's live in the system." (Tr. 9/18/13 21:3-10.)

8

19:20-20:3.) Communication between the server and the LPRs is therefore a "two-way street": "updates come from the server, [and] reads go to the server." (Id. 20:3-5.)

The Government then presented Colleen Richart. Richart is employed by the Maryland State Police, assigned to the MCAC, and is the current manager and coordinator for Maryland's LPR program. (Id. 24:24-25:4). Richart confirmed that the MCAC did not come into existence until "the first quarter of 2011," meaning February or March 2011. (Id. 25:17-24; 26:13-15.) Thus, Richart confirmed, in June 2010 Trooper Butler's LPR would have been communicating with the MSP server, not the MCAC server (which was not then in existence). (Id. 25:25-26:9.)

The Government next called Sergeant Pietanza, the purported author of the aforementioned January 24, 2013 letter that forms the basis of Petitioner's instant motion. Sergeant Pietanza is the criminal investigation supervisor for the MSP College Park Barrack, and responded to Petitioner's information request as part of his administrative duties. (Id. 28:23-29:2.) Sergeant Pietanza explained that his letter was a verbatim recitation of the response the MSP Legal Counsel instructed him to give to Petitioner. (Id. 29:3-24.)[6] Sergeant Pietanza testified that information from the NCIC was available to Maryland's LPRs in June 2010. (Id. 30:13-18.) Nevertheless, Sergeant Pietanza also testified that the letter's assertion that "[t]he MCAC central server houses LPR data from Maryland law enforcement agencies and is not

---

[6] By way of further explanation, Sergeant Pietanza forwarded Petitioner's information request, via email, to an unidentified person with the MSP Legal Counsel. Someone then emailed Sergeant Pietanza a response to send to Petitioner. Sergeant Pietanza copied the text of the email, pasted it into a document, and printed the response on MSP letterhead. (Tr. 9/18/13 29:3-24.) Thus, according to Sergeant Pietanza's testimony, although his signature appears on the letter, he is not the *true* author of the letter (in the sense that he is not directly responsible for its wording and substance).

9

nationwide" is "correct." (Id. 34:21-35:19.) As will be discussed, Sergeant Pietanza provided no explanation as to why the letter is supposedly correct.

**C. Analysis**

As previously stated, the outstanding issue before the Court is whether Trooper Butler's testimony that his LPR detected that the vehicle Plaintiff was driving was stolen was perjured. The crux of the claim is whether, at the time of the stop, Trooper Butler's LPR had the capacity to identify vehicles that were stolen outside of Maryland, or if it was limited to detecting stolen cars from the local and state areas. It is Petitioner who bears the burden of proof in establishing his claims. See e.g. United States v. Hollis, 569 F.2d 199, 205 (3d Cir. 1977) ("[I]n habeas cases the general rule is that the petitioner himself bears the burden of proving that his conviction is illegal."); Gov't of Virgin Islands v. Nicholas, 759 F.2d 1073, 1081 (3d Cir.1985); Langston v. United States, 105 F. Supp. 2d 419, 422 (E.D. Pa. 2000) ("In general, 'a person seeking to vacate his conviction bears the burden of proof upon each ground presented for relief.'") (quoting Walden v. United States, 418 F.Supp. 386, 388 (E.D.Pa.1976)).

The Court finds that Petitioner has failed to meet this burden. The unrebutted testimony of Sergeant Valcarcel, Ms. Richart, and Sergeant Pietanza indicates that Trooper Butler's LPR had the capacity to identify vehicles that were stolen outside of Maryland. Thus, to the extent the January 24, 2013 letter connotes otherwise, the letter is incorrect.[7] Petitioner has presented

---

[7] The letter is incorrect in at least two respects. The letter first states, "The MCAC program began in March of 2010." The testimony of Sergeant Valcarcel and Ms. Richart indicates that the MCAC was not officially up and running until early 2011, although it appears the MCAC existed in some nascent form prior to early 2011. In addition, the letter goes on to state "[t]he MCAC central server houses LPR data from Maryland law enforcement agencies and is not nationwide." The first clause of this sentence accurately represents the current state of affairs. However, the testimony of Sergeant Valcarcel and Ms. Richart indicates that during the relevant time period, June 2010, Maryland's LPRs were communicating with a server located at MSP

no evidence — other than his own assertions and the vague January 24, 3013 letter — which suggests Trooper Butler's LPR did not have access to a nationwide database of vehicles reported stolen to the NCIC.[8] This is plainly insufficient.

During the October 9, 2013 hearing, Petitioner argued that the Government did not present testimony at the September 18, 2013 hearing as to "how the NCIC data from the FBI made it to the Maryland state server." (Tr. 10/9/13 3:18-20.) Likewise, Petitioner contended that "they [the Government] have not rebutted the claim that they had an operating system that could receive out-of-state information." (Id. 5:12-14.) These arguments, however, frame the issue improperly by misplacing the burden of proof. The issue before the Court is whether Petitioner can present anything to support his claim, not whether the Government can present anything that disproves Petitioner's unsupported claim. As such, the Government's limited obligation is to demonstrate that, contrary to what the January 24, 2013 letter appears to suggest, the Maryland LPRs were capable of accessing nationwide data on stolen vehicles. The Government, through the testimony of its witnesses, has met that obligation. Conversely, Petitioner presents nothing which refutes or calls into question the testimony of the Government's witnesses.

## IV. CONCLUSION

For the reasons explained above, the Court will deny White's motion under 28 U.S.C. § 2255. Thus, the court must determine if a certificate of appealability should issue. A court may

---

headquarters, not at the MCAC. Further, the assertion that the LPR data "is not nationwide" is at best ambiguous, and at worst mistaken.

[8] Indeed, the evidentiary hearing was held over the course of two days, more than a month apart. Nonetheless, Petitioner called no witnesses and presented no evidence to support his claims other than the letter signed by Sergeant Pietanza which, as it turns out, was not actually written by Sergeant Pietanza.

issue a certificate of appealability only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires that the petitioner "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Here, the Court has determined that on the basis of the record before the Court, including testimony and arguments presented at the evidentiary hearing, White's claims are unsupported. The Court is persuaded that reasonable jurists would not find this assessment debatable or wrong. Therefore, White has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not issue.

    An appropriate order follows.